Filed 5/11/22  Doe v. Oceanside Unified School Dist. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| VICTORIA DOE,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>OCEANSIDE UNIFIED SCHOOL DISTRICT,<br><br>Defendant and Respondent. | D078502<br><br><br><br>(Super. Ct. No. 37-2018-00024388-CU-PO-NC) |

APPEAL from a judgment of the Superior Court of San Diego County, Timothy M. Casserly, Judge.  Affirmed.

Law Offices of John E. Hill and John E. Hill for Plaintiff and Appellant.

Winet Patrick Gayer Creighton & Hanes and Aaron C. Hanes for Defendant and Respondent.

## I.

## INTRODUCTION

Plaintiff Victoria Doe was sexually assaulted on at least five occasions by a bus driver employed by defendant Oceanside Unified School District (the

District) while traveling on a special education bus route operated by the District.[1]  The bus driver would touch plaintiff's genital area over her clothing for a brief moment and then return to his seat.  On each occasion, the touching occurred while another District employee, a bus attendant, was assisting another student in getting secured in her seat.  After plaintiff told her mother about the abuse and her mother reported it to the District, the District placed the driver on leave and reviewed video recordings taken from inside the bus.  The District provided police with five recordings that showed the bus driver leaning into plaintiff's personal space and terminated the driver's employment.  The bus driver admitted criminal liability for his conduct.

Plaintiff brought this civil action against the bus driver and the District, alleging that the District is liable for the injury she suffered as a result of the District's failure to protect her from sexual abuse committed by the bus driver.

After the parties engaged in discovery, the District moved for summary judgment, contending that it was entitled to judgment as a matter of law. The District conceded that a school district may be held liable for negligent supervision or retention when its administrative personnel knew or should have known of an employee's sexual propensities and nevertheless hired, retained, and/or inadequately supervised that employee (see *C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861 (*C.A.*)).  However, the District contended that the undisputed facts demonstrated that "no one in the administration or on the staff at the District had actual knowledge of any assaultive propensities of [the bus driver]."  Specifically, the District

---

[1]     It is undisputed that, although plaintiff was assigned to this bus route, she did not require any special assistance with transportation.

2

contended that the facts demonstrated that not only were supervisory personnel unaware that the bus driver posed a risk for sexual abuse, but the only other District employee who was on the bus at the time the assaults occurred, the bus attendant, had not seen the inappropriate conduct and "never had a reasonable suspicion" that the driver had sexually abused any student on the bus; thus, she could not have made District supervisors aware of any suspicious activity on the part of the bus driver. The trial court agreed that the District was entitled to judgment as a matter of law based on the undisputed material facts.

On appeal, plaintiff contends that the trial court erred in granting summary judgment because there remain material facts in dispute as to whether the District sufficiently trained the bus attendant regarding the proper roles of a bus attendant and bus driver, or as to the bus attendant's obligations as a mandated reporter of sexual abuse. Plaintiff contends that a reasonable fact finder could conclude that, if the bus attendant had been properly trained, she would have understood that the bus driver's conduct in approaching plaintiff and invading her personal space was suspicious and should be reported to a supervisor, and that if the bus attendant had reported the driver's suspicious conduct, that would have saved plaintiff from additional injury resulting from ongoing abuse.

We conclude that undisputed material facts as to what the bus attendant actually observed do not permit a reasonable factfinder to conclude that the bus attendant should have been suspicious of the bus driver's conduct. We therefore affirm the trial court's entry of judgment in favor of the District.[2]

_____

[2] Although we conclude that the District is entitled to judgment as a matter of law, our conclusion should not be understood as dismissing the

3

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual background[3]*

    1. *General factual background*

On May 11, 2017, plaintiff was a minor student enrolled in fifth grade at an elementary school in the District. On that date, plaintiff was transported to her school on a District school bus.

The driver of plaintiff's school bus was Logan Cortes. Cortes applied for the position of bus driver in 2014. Applicants for the bus driver position at the District must meet certain requirements in order to be considered for employment; these requirements include possessing a valid driver's license, providing a current medical report and certificate, providing a complete driving history printout from the Department of Motor Vehicles (DMV) and a licensing eligibility document, and being fingerprinted by the California Highway Patrol so that the fingerprints can be sent to the Department of Justice, and if applicable, to the Federal Bureau of Investigation for a criminal background review. The DMV is required to deny or revoke a

---

seriousness of the nature of the bus driver's actions or the injuries plaintiff suffered as a result of those actions. What the bus driver did was clearly worthy of condemnation. Our conclusion is merely that the undisputed facts presented on summary judgment demonstrate that the District is entitled to judgment as a matter of law because there is no evidence that the District was negligent.

[3]     Because this appeal is taken after a grant of summary judgment, we recite the facts that are not in dispute. To the extent that there is a dispute about a fact or the inference to be gleaned from certain facts, we will describe the parties' differing views of the evidence and what inferences may be drawn from the evidence in the light most favorable to plaintiff.

licensing eligibility document if an individual is or has been convicted of a sex offense or certain other crimes.

Cortes received initial pre-employment training from the District on or about March 17, 2014 through the end of March 2014, before he applied for a position as bus driver. The pre-employment training that Cortes received included instruction regarding the fact that an individual is prohibited from being employed as a school bus driver if that person has been convicted of a sex offense as defined in Education Code section 44040 or any act set forth in Vehicle Code section 13370 involving any act of moral turpitude.

Cortes passed the District's fingerprint and background check on August 27, 2014. Cortes had no record of having suffered any criminal conviction.

Cortes was hired by the District as a substitute bus driver on September 15, 2014. He was hired as a full-time bus driver on March 9, 2015.

Cortes, like all District bus drivers, received back to school in-service training by the District at the beginning of each school year. Cortes also received periodic training from the District, as all bus drivers do.[4]

Cortes began driving Bus Route 706 (a morning route) on March 1, 2017. Plaintiff was a passenger on Bus Route 706 on that date. She had never seen Cortes prior to March 1. Margaret Sakamoto was a District bus

---

[4]    The record demonstrates that during his tenure as a bus driver, Cortes received multiple trainings specifically pertaining to sexual misconduct. On September 2, 2015, Cortes received mandatory sexual harassment and mandated reporter training provided by the District. On September 10, 2015, Cortes received two trainings titled "Sexual Misconduct: Staff to Student" and "Sexual Harassment: Staff to Staff" offered by the District through "Keenan SafeSchools." On September 12, 2016, Cortes received mandated reporter training offered by the District through "Keenan SafeSchools."

attendant.  She also began her duties on Bus Route 706 on March 1, 2017.
On the route, Sakamoto assisted the students in getting on and off of the bus, making sure the students were safely secured in a seat appropriate for their needs, and supervising the students on the bus.  Sakamoto had received training from the District over a ten-year period, which included monthly departmental meetings, yearly back to school in-service trainings, and periodic training sessions during the school year.[5]

Approximately eight or nine special needs students rode on Bus Route 706 during the relevant time period.  Plaintiff did not have an individual education program (IEP) that required the assistance of a bus attendant. However, other students who rode that bus had IEPs that required such assistance, which is why Sakamoto was placed on Bus Route 706.

Plaintiff always sat in the first or second row of the bus when she rode to school in the morning during her fifth grade year.  Plaintiff and her mother thought that Cortes seemed nice, and plaintiff never felt unsafe on the school bus prior to the first incident of inappropriate touching.  Although plaintiff did not require assistance with buckling her seat belt on the school bus, on

---

[5]    Among the trainings that Sakamoto received were the following:  On September 10, 2015, Sakamoto received mandated reporter training offered by the District through "Keenan SafeSchools."  On that same date, Sakamoto received a training titled "Sexual Misconduct: Staff to Student," offered by the District through "Keenan SafeSchools."  On August 24, 2016, Sakamoto received another mandated reporter training offered by the District through "Keenan SafeSchools."  Plaintiff points out that Sakamoto's annual training from the District with respect to how to identify and prevent child abuse consisted of yearly half-hour online programs.

one occasion, before the inappropriate incidents began, Cortes did assist plaintiff with a seatbelt that had become twisted.[6]

   2. *Facts regarding the sexual touching incidents that occurred on the school bus*

According to plaintiff, the first inappropriate touching incident occurred on an unknown date, and lasted for one second.[7] Cortes touched plaintiff between her legs, over her clothing, in the vaginal area. Plaintiff concedes that no one other than plaintiff and Cortes witnessed the actual touching. However, in admitting that "no one other than plaintiff and Cortes saw the actual incident [on May 11, 2017]," plaintiff also asserted that she "denied [the statement that no one saw the incident] to the extent that . . . Sakamoto observed interaction between the driver and plaintiff, if shown in the video surveillance footage."

After this first incident, Cortes inappropriately touched plaintiff on five to eight separate occasions during the last stop on the bus route, before the bus reached the school, while Sakamoto was in the back of the school bus assisting another student. The parties dispute whether the touching was done "very quickly" or not. However, plaintiff testified that the instances of

---

[6]   Plaintiff contends that the District did not make Sakamoto aware of any special needs that plaintiff may have had prior to Sakamoto serving as an attendant on Bus Route 706. The District notes that because Sakamoto was assigned to the bus to serve as a bus attendant for another student whose individual education plan (IEP) required the assistance of a bus attendant while plaintiff's IEP did not require the assistance of a bus attendant, there was no need for Sakamoto to be made aware of plaintiff's specific needs.

[7]   According to plaintiff, although the exact date is unknown, the first inappropriate touching occurred approximately two months after Cortes began driving Bus Route 706.

7

inappropriate touching lasted for "[a] sec[ond]." Each time Cortes touched plaintiff inappropriately, he touched her on the outside of her clothing.

It is undisputed that, from plaintiff's location in the front of the bus, Cortes could return to the driver's seat in one or two quick steps.[8]

Sakamoto did not see Cortes touch plaintiff on May 11, 2017, nor on any other day prior to May 11, 2017.[9] Sakamoto did not have any indication that Cortes had touched any student, including plaintiff, in an inappropriate or sexual manner at any time on or before May 11, 2017.[10]

The District had not received any complaints about Cortes behaving inappropriately with any student prior to May 11, 2017, and District personnel did not have any indication or knowledge that Cortes had touched any student, including Plaintiff, in an inappropriate or sexual manner at any time on or prior to May 11, 2017. Once the allegation of inappropriate touching was made by plaintiff, the District investigated the matter and Cortes was placed on leave as of May 15, 2017, while the investigation was pending.

_____

[8] The first seat on the bus was "right across from the driver."

[9] Sakamoto also testified that she did not see Cortes touch plaintiff in an inappropriate or sexual manner on May 11, 2017. With respect to this testimony, plaintiff admitted that Sakamoto "did not see Logan Cortes touch Plaintiff . . . on May 11, 2017 in what she considered to be an inappropriate or sexual manner" and that Sakamoto "claims not to have observed Logan Cortez touching plaintiff in an inappropriate manner." Plaintiff admitted that it was undisputed that Sakamoto did not see Cortes touch plaintiff at all on that date.

[10] Plaintiff admitted that it was undisputed that Sakamoto "did not have any indication that Logan Cortes had by her understanding touched any student, including Plaintiff . . . in an inappropriate or sexual manner at any time on or before May 11, 2017."

District buses, including the one driven by Cortes, are equipped with video surveillance cameras that are placed in such a way that they are obvious to those who are on the bus. The cameras record activity that occurs on the buses. The District's "driver instructor," Tracy Mangold, stated that District bus drivers and attendants "are informed" that the District uses these cameras on its buses. After plaintiff's mother reported Cortes's abuse, Mangold reviewed the videotapes from the bus that Cortes had been driving, looking for evidence that would lead to a reasonable suspicion of inappropriate behavior. After Mangold's review, the District selected five video recordings, taken on May 4, May 8, May 9, May 10, and May 11, 2017, to turn over to police.[11]

The District placed Cortes on leave during the investigation, and terminated his employment on September 26, 2017. On October 19, 2017, Cortes pled guilty to violating Penal Code sections 288, subdivision (a) and 368, subdivision (c).

B. *Procedural background*

Plaintiff filed a complaint against Cortes and the District on May 16, 2018. Plaintiff asserted that the District was liable for the injury caused to her by the acts and/or omissions of its employees under Government Code section 815.2, subdivision (a), which provides that " '[a] public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative.' " Plaintiff sought damages from both Cortes and the District.

---

[11] Mangold told a police officer that her review of the videos from the bus showed that Cortes " 'was standing unusually close to Doe on several occasions.' "

The District brought a motion for summary judgment on July 24, 2020. After full briefing and a hearing on the matter, the trial court granted the District's motion for summary judgment in full on October 27, 2020.

With respect to plaintiff's argument that the presence of a bus attendant on the bus meant that the District could be held liable for negligent supervision, the trial court reasoned:

> "The first half of [plaintiff's] response [to the District's assertion that Sakamoto did not see Cortes touch plaintiff on any day prior to May 11, 2017] more closely gets at the fact in question, which is *whether the Bus Aide saw* any inappropriate touching prior to May 11, 2017. However, again with careful parsing, [plaintiff's response] does not actually present a *factual* difference. The School recites that the Bus Aide 'did not see' any inappropriate conduct prior to May 11, 2017; Plaintiff's response does not produce evidence that [the bus attendant] *did* see (or even evidence that she was *aware*) of such conduct, rather, Plaintiff just re-frames the statement so that instead of being a statement of *fact* it is, after Plaintiff's re-arranging, merely what the Bus Aide 'claims.' This is insufficient to create a triable issue of fact. Moreover, the Court notes that Plaintiff's response on this item in the separate statement does not *cite evidence* with reference to the exhibit, title, page, and line number as required under Cal. Rules of Court, rule 3.1350(f)(2). Rather, it cites *other responses to items in the separate statement*. This is procedurally improper and grounds for disregarding the response as being unsupported by any factual citations. Moreover, looking at the other items that are cited in this response, they appear to be recitations of the fact that *surveillance footage* of several of the incidents exists. In other words, Plaintiff's contention seems, at first blush, to be that though the Bus Aide states that she did not see any of these incidents, a finder-of-fact could look at the surveillance footage of these incidents and conclude that the Bus Aide is lying when she says she did not see the incident(s). However, on closer examination, Plaintiff is not advancing the position that the Bus Aide is lying about

10

never having seen the Bus Driver engaging in inappropriate activity. Indeed, one of the facts that Plaintiff admits is 'undisputed' reads as follows:

"79. *[The Bus Aide] never saw [the Bus Driver] assist plaintiff with her seatbelt.*

"(ROA 129, ¶ 79.) Based on these several items of evidence, there does not appear to be a dispute over the fact that the Bus Aide did not *actually know* that any inappropriate conduct was occurring, though there remains some analysis as to whether the Bus Aide *should* have known of such conduct."

The trial court proceeded to consider whether there remained disputed material facts as to whether Sakamoto should have known that Cortes was abusing plaintiff.[12] The court concluded that, based on the undisputed facts, "even if the Bus Aide had been familiar with Plaintiff's particular needs and the fact that those needs did not include the need for help with a seatbelt, the Bus Aide *still* would not have caught the suspicious activity because knowing or not knowing of the *need* was not the issue—*seeing* the conduct in the first place was the issue." Finally, the court also stated that it had reviewed the relevant videos, and "[h]aving reviewed the video[s], the Court concludes that

---

[12] The trial court made clear that the undisputed evidence demonstrated that Sakamoto was not a supervisor or administrator, such that what she knew or should have known would not address the direct question of whether the District could be held liable " 'for the negligence of *supervisory* or *administrative* personnel who allegedly knew, or should have known, of the [employee]'s propensities and nevertheless . . . inadequately supervised [the employee.]' " Instead, what Sakamoto knew or should have known was significant because if Sakamoto knew or should have known that abuse was occurring, then a supervisor also "should have known" of the inappropriate conduct because, as a mandated reporter, Sakamoto was required to report any reasonable suspicion of abuse.

11

no *reasonable* fact-finder could conclude that the Bus Aide knew or should have known about the alleged inappropriate activity."

The court entered judgment in favor of the District on November 5, 2020.

Plaintiff filed a timely notice of appeal from the judgment.

III.

DISCUSSION

A.  *Standards on review from summary judgment*

Code of Civil Procedure section 437c, subdivision (c) provides that summary judgment is to be granted "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A defendant "moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).)  A defendant may meet this burden either by showing that one or more elements of a cause of action cannot be established or by showing that there is a complete defense. (*Ibid.*; Code Civ. Proc., § 437c, subd. (p)(2).)  If the defendant's prima facie case is met, the burden shifts to the plaintiff to show the existence of a triable issue of material fact with respect to that cause of action or defense. (*Aguilar, supra*, 25 Cal.4th at p. 850; Code Civ. Proc., § 437c, subd. (p)(2).)  "[T]o meet that burden, the plaintiff '. . . shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action . . . .' " (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476–477.)

" 'The purpose of a summary judgment proceeding is to permit a party to show that material factual claims arising from the pleadings need not be

tried because they are not in dispute.' [Citation.] 'The function of the pleadings in a motion for summary judgment is to delimit the scope of the issues: the function of the affidavits or declarations is to disclose whether there is any triable issue of fact within the issues delimited by the pleadings.' [Citations.] The complaint measures the materiality of the facts tendered in a defendant's challenge to the plaintiff's cause of action. [Citation.]" (*FPI Development, Inc. v. Nakashima* (1991) 231 Cal.App.3d 367, 381.)

In reviewing a grant of summary judgment, we conduct an independent review to determine whether there are triable issues of material fact and whether the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Aguilar, supra*, 25 Cal.4th at p. 843.) We apply the same standards as the trial court—i.e., a defendant must show that at least one element of the plaintiff's cause of action cannot be established, or that there is a complete defense to the cause of action, and if such a showing is made, the burden then shifts to the plaintiff to show that there is a triable issue of material fact as to that issue. (Code Civ. Proc., § 437c, subds. (o), (p)(2); see *Alex R. Thomas & Co. v. Mutual Service Casualty Ins. Co.* (2002) 98 Cal.App.4th 66, 72.) We construe the moving party's evidence strictly, and the nonmoving party's evidence liberally, in determining whether there is a triable issue. (*Alex R. Thomas*, at p. 72.)

While a court considering a motion for summary judgment may not weigh the admitted evidence as though sitting as a trier of fact, a court "must nevertheless determine what any evidence or inference *could show or imply to a reasonable trier of fact. . . .* In so doing, [we do] not decide on any finding of [our] own, but simply decide[ ] what finding such a trier of fact could make for itself." (*Aguilar, supra*, 25 Cal.4th at p. 856.)

13

B.  *The trial court's evidentiary rulings*

In challenging the trial court's grant of summary judgment in favor of the District, plaintiff contends that the court abused its discretion with respect to a number of its evidentiary rulings.  In particular, plaintiff challenges the court's exclusion of evidence that she presented through the declarations of retired police officer Edward Lane and expert Linda Bluth.[13]

The traditional rule regarding appellate review of evidentiary rulings in summary judgment proceedings is that such rulings are reviewed for an abuse of discretion.  (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 852.)  However, in the wake of the decision in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535, there exists an open question as to whether the traditional rule remains the standard, or rather, whether the standard of review of evidentiary rulings on summary judgment is de novo.  The question of which standard applies would not alter our conclusions in this case because, to the extent that we affirm the trial court's evidentiary rulings, we would do so under either standard.

1.  *Evidence offered by Officer Edward Lane*

Plaintiff offered the declaration of retired police officer Edward Lane, who had been a police officer for more than 30 years.  He served as the liaison officer with the District during the time period when the events at issue in this case transpired.  Plaintiff asserts that the trial court erred in sustaining eight of the District's objections to evidence included in Lane's declaration, which was submitted in opposition to the District's motion for summary judgment.

---

[13]   Plaintiff notes that, although the trial court rejected 34 of the District's 44 objections to plaintiff's evidence, the court sustained the remaining 10 objections and erred in doing so.

a. *Objections 6 and 8*

The trial court sustained the District's objections to paragraphs 8 (objection number 6) and 10 (objection number 8) of the Lane declaration.

In paragraph 8 of Lane's declaration, he summarizes what he contends the District's Director of Transportation Linda Horton told him after viewing the video recordings from the bus: " 'Ms. Horton told me that she had viewed video of the alleged inappropriate touching of plaintiff . . . on the Oceanside Unified School District bus driven by Oceanside Unified School District employee Logan Cortes. Ms. Horton stated that she was concerned that Cortes seemed to single out [plaintiff] and that Cortes frequently walked over to where [plaintiff] was seated. Ms. Horton told me that the video showed Cortes standing unusually close to [plaintiff], and that this invasion into [plaintiff's] personal space was not warranted.' "

The District objected to this paragraph, contending that the statements in paragraph 8 misstated evidence, lacked foundation, were based on information beyond Lane's personal knowledge, were irrelevant, lacked authentication, were vague and ambiguous, constituted inadmissible speculation and conclusions, and were hearsay.

In paragraph 10, Lane summarizes what he contends Mangold told him after viewing the video recordings from the bus: " 'Ms. Mangold told me that when she viewed the video recordings, she saw Cortes leaving his driver's seat and going over to where [plaintiff] was seated. Ms. Mangold told me that on the video recordings, Cortes was standing unusually close to [plaintiff] on several occasions. Ms. Mangold told me that it was unusual for a bus driver to stand so close to a student, because each bus had a bus attendant, and the attendant's primary duty was to help the students into their seats, out of their seats and on and off the bus.' "

The District objected to this paragraph on the grounds that the statements in paragraph 10 misstated evidence, lacked foundation, were based on information beyond Lane's personal knowledge, were irrelevant, lacked authentication, were vague and ambiguous, constituted inadmissible speculation and conclusions, and were hearsay.

The District's main objection to paragraphs 8 and 10 of the Lane declaration was that the contents of the police report were being offered to prove the truth of the matter asserted by the declarants whose statements were repeated in those reports.

Plaintiff argues that the trial court had overruled the District's general objection to the introduction of the actual police report, which contained Horton's and Mangold's statements to police, so the statements were in evidence, regardless. Further, plaintiff contends that because Horton and Mangold made their statements while employed as administrators of the District who were responsible for student transportation, the statements "represent admissions" by the declarants, and thus qualify as an exception to the hearsay rule under Evidence Code section 1224.[14]

Even if we were to assume that the trial court erred in excluding these two statements on hearsay or other grounds raised by the District, as the court likely understood, neither of the statements attributed to District administrators is useful in assessing the question at hand, which is whether *Sakamoto* witnessed the conduct discussed by Horton and Mangold after

---

[14] Evidence Code section 1224 provides: "When the liability, obligation, or duty of a party to a civil action is based in whole or in part upon the liability, obligation, or duty of the declarant, or when the claim or right asserted by a party to a civil action is barred or diminished by a breach of duty by the declarant, evidence of a statement made by the declarant is as admissible against the party as it would be if offered against the declarant in an action involving that liability, obligation, duty, or breach of duty."

their review of the videotapes, such that Sakamoto reasonably should have suspected that Cortes was engaging in inappropriate sexual conduct with plaintiff. The mere fact that Cortes's actions could be observed from the point of the view of the camera, which was located at the front of the bus, pointed toward the students' seats, does not lead to the conclusion that Sakamoto must have, or even could have, seen Cortes's actions. Thus, what Mangold and Horton described seeing on the video recordings is not helpful in determining what Sakamoto actually witnessed on the bus. The statements were therefore excludable as irrelevant; even if admitted, they do not create a triable issue of fact.

### b. *Objections 11, 16, 17, 18, 19, and 20*

The trial court sustained the District's objections numbered 11, 16, 17, 18, 19, and 20,[15] all of which involved challenges to paragraphs in Lane's

---

[15] In objection number 11, the District objected to Lane's discussion of the duties and responsibilities of a bus driver and a bus attendant on the District's buses. In objection number 16, the District objected to Lane's recitation of the District's " 'School Bus Attendant Class Specification' " description of the role of a bus attendant. In objection number 17, the District objected to certain statements in paragraph 19 of Lane's declaration, in which he summarized some of the examples of a bus attendant's duties as set forth in the District's "School Bus Attendant Class Specification."

In objection number 18, the District objected to Lane's opinion that, "given the duties of a bus attendant" as outlined in the District's documents, "a problem exists if the attendant cannot spot the driver's suspicious conduct as occurred here," that Sakamoto's ability to discern questionable conduct by Cortes may have been clouded by her belief that Cortes was a "good guy," and that "it is difficult to understand how" Sakamoto did not become suspicious of Cortes's "continued interest in one student." In objection number 19, the District objected to Lane's statement that, in his experience, victims of molestation often do not report abuse immediately, which makes timely intervention by an adult all the more important. In objection number 20, the District objected to Lane stating that, while viewing the video recordings, he

declaration, on the ground that the statements contained what amounted to expert opinions, even though Lane had not been designated or established as an expert.[16] We agree with the trial court's assessment that the statements at issue constitute expert opinion. It is not an abuse of the court's discretion to exclude statements that constitute expert opinions when those opinions are offered by a witness who has not been designated and established as an expert. (See, e.g., *Unzueta v. Akopyan* (2019) 42 Cal.App.5th 199, 219 [generally a trial court is to exclude from evidence expert opinions offered by a witness who has not been designated as an expert]; *Pina v. County of Los Angeles* (2019) 38 Cal.App.5th 531, 546 [same].)

In addition, as to objections 16 and 17, the District also objected that the document to which Lane was referring "speaks for itself." In these portions of the declaration, Lane purported to recite a portion of the District's written "School Bus Attendant Class Specification" or offer a summary of one part of this document. As such, Lane's statements were secondary evidence and excludable; the best evidence of what the District's document provides

---

observed the driver engage in an inappropriate act with another student on the bus, and that Sakamoto took no action with respect to this conduct.

[16] The trial court noted that "[o]ne of the most frequently-repeated challenges to the declaration of police officer Edward Lane (Officer Lane) is that he has not been established as an expert witness and yet is providing expert testimony." The court explained that Lane had recited "a number of points of training and expertise," in "a manner akin to reciting the credentials of an expert witness[ ]." Although these details were "informative in terms of the narrative arc of this case and how the conduct of the Bus Driver was eventually uncovered and prosecuted, this evidence [regarding Lane's background and expertise] does not actually establish Officer Lane as an expert witness – nor does it appear that Plaintiff is seeking to put forth Officer Lane as an expert witness." For these reasons, the court "sustain[ed] objections where Officer Lane is testifying as to his opinion in the manner that an expert would . . . ."

with respect to the role of a bus attendant is the document itself. (See *Meadows v. Lee* (1985) 175 Cal.App.3d 475, 490 [an objection that a document "speaks for itself' " is a reference to the secondary evidence rule, formerly known as the " 'best evidence' " rule]; see also Evid. Code, § 1523, subd. (a) ["Except as otherwise provided by statute, . . . testimony is not admissible to prove the content of a writing"].) Further, as to Lane's statement about observing Cortes engage in an "inappropriate act" with another student on the bus, which was the subject of objection 20, the District also objected to the statement's admission on relevance and best evidence grounds. The court properly sustained objection 20 on these grounds; the content of the video recording speaks for itself, and what Lane observed on the video recordings is not relevant to establish what Sakamoto could have observed or did observe from her perspective on the bus.

In sum, we conclude that the trial court did not err in sustaining objection numbers 6, 8, 11, 16, 17, 18, 19, and 20 as to the Lane declaration.

2. *The objections sustained as to evidence offered by Linda Bluth*

Plaintiff also offered the declaration of Linda Bluth in support of plaintiff's opposition to the District's motion for summary judgment. Bluth is an expert in the field of transportation, with a specialization in school transportation services related to young children and children with disabilities. In contrast to Lane, plaintiff had designated Bluth as an expert and offered her testimony as expert testimony. With respect to much of Bluth's declaration, however, the court determined that the "testimony of Expert Bluth is capable of being considered [as expert testimony], but is ultimately quite summary in nature, lacking foundation as to how the opinion was formed with the expert's special knowledge, and mismatched to

19

the issues presented." The court offered specific evidentiary analysis with respect to certain of Bluth's statements.

> a. *Objection number 32*

The trial court sustained the District's objection number 32, regarding paragraph 18 of Bluth's declaration. In paragraph 18 of her declaration, Bluth stated:

> "18. OUSD did not make [the Bus Aide] aware of any special needs of the plaintiff, as required, prior to having [the Bus Aide] serve as the plaintiff's bus attendant. In fact, [the Bus Aide] admits that she observed nothing, and was not aware of, any of plaintiff's special needs until she asked plaintiff why plaintiff was on school bus route 706. This is unacceptable. In all of my years of working in the field of transportation for students with disabilities, I have never encountered an instance in which a school bus attendant asked a child why they were placed on a school bus. This information should have been readily available for review by the attendant prior to plaintiff riding on route 706. It is essential that school bus attendants receive appropriate training and information to understand the characteristics of the children with disabilities that they are responsible to supervise. In fact, the IDEA requires that all personnel working with children with disabilities be knowledgeable about the children they are serving."

The District objected to this statement on the grounds that it misstated the evidence, lacked foundation, constituted hearsay, was irrelevant, lacked sufficient authentication, and constituted inadmissible speculation and conclusions.

We conclude that the trial court did not err in sustaining the District's objection because the statement was not relevant to the question at issue. Specifically, as the trial court noted, Bluth's testimony in this paragraph "misses the mark" because this statement is not relevant to the question whether Sakamoto should have had reasonable suspicion that Cortes was

20

sexually assaulting plaintiff.  The factual connection that plaintiff appears to be trying to make between this opinion and the question relevant to the District's potential liability stems from plaintiff's suggestion that Sakamoto should have been aware that plaintiff did not require assistance with her seatbelt, and that if Sakamoto had been aware that plaintiff did not require assistance with her seatbelt, then the fact that Cortes was repeatedly " 'helping' " plaintiff with her seatbelt would have given Sakamoto cause for concern and raised a reasonable suspicion of something nefarious.  However, this argument presumes an underlying factual premise that the undisputed facts do not support; it is undisputed that "Sakamoto *never* saw Cortes assist plaintiff with her seatbelt."  (Italics added.)  Therefore, it is of no consequence that Sakamoto may have been unaware of plaintiff's lack of need of assistance with her seatbelt.

> b.  *Objection number 34*

The trial court sustained the District's objection number 34, regarding paragraph 20 of Bluth's declaration.  In that paragraph, Bluth stated:

> "It is incomprehensible that the school bus attendant, Ms. Sakamoto, never saw the bus driver engage in unusual behavior in regards to the plaintiff.  Given that there were repeated inappropriate acts by the bus driver, it is both shocking and disturbing that Ms. Sakamoto would state, as she has done, that she had not witnessed any inappropriate behavior by the bus driver.  Even the bus driver's repeated actions in regularly leaving his seat and going to where the plaintiff was sitting to assist with her seat belt, were that not just an attempt at deception, should have been subject to scrutiny both because Ms. Sakamoto's role was to assist the plaintiff with such tasks and because Ms. Sakamoto was aware that the plaintiff did not require such assistance."

21

The District objected to this statement on the grounds that it was argumentative, misstated the evidence, lacked foundation, constituted hearsay, was irrelevant, lacked sufficient authentication, and constituted inadmissible speculation and conclusions.

We conclude that the trial court properly sustained the District's objection, given that Bluth misstates the facts that are undisputed and the evidence underlying those facts. Again, it is *undisputed* that Sakamoto did not observe Cortes touch plaintiff, let alone observe him touch plaintiff inappropriately; it is also undisputed that Sakamoto did not observe Cortes assist plaintiff with her seatbelt. Thus, Bluth's presumption that Sakamoto should have been on notice of Cortes's "inappropriate behavior" because of his "repeated actions in regularly leaving his seat and going to where the plaintiff was sitting to assist with her seat belt" is without evidentiary support. Further, the statement that Sakamoto's role "was to assist the plaintiff with such tasks" as "assist[ing] with her seat belt," even though Bluth also asserts that Sakamoto "was aware that the plaintiff did not require such assistance [with her seatbelt]," is also unsupported by the evidence. Rather, the only evidence regarding why Sakamoto was assigned to the bus route was to ensure that students *other* than plaintiff had the assistance required by those children's individual education plans (IEPs); plaintiff did not have an IEP that required the assistance of a bus attendant.

Given the lack of facts supporting the majority of Bluth's statements in this paragraph, we further conclude that her opening statement in the paragraph—"It is incomprehensible that the school bus attendant, Ms. Sakamoto, never saw the bus driver engage in unusual behavior in regards to the plaintiff"—is argumentative and lacks foundation, and was properly rejected on this basis.

22

We therefore affirm the trial court's evidentiary rulings with respect to the Bluth declaration.

C. *The trial court's summary judgment ruling*

Plaintiff alleged a single cause of action against the District in the complaint—i.e., a cause of action under Government Code section 815.2 for the District's alleged negligence in failing to protect plaintiff from Cortes's sexual abuse.

" 'To establish a cause of action for negligence, the plaintiff must show that the "defendant had a duty to use due care, that [it] breached that duty, and that the breach was the proximate or legal cause of the resulting injury." [Citation.] Recovery for negligence depends as a threshold matter on the existence of a legal duty of care.' " (*Doe v. The Roman Catholic Archbishop of Los Angeles* (2021) 70 Cal.App.5th 657, 669.)

In *C.A., supra*, 53 Cal.4th at p. 865, the Supreme Court determined that a school district may be found liable for the sexual misconduct of its employees under Gov. Code, § 815.2, where the plaintiff can prove that supervisory or administrative personnel were negligent, in that they knew, or should have known, of the violating employee's propensities and nevertheless hired, retained and/or inadequately supervised that employee.[17] *C.A.*

_____

[17] It is clear that a school district may not be held vicariously liable for an employee's criminal acts under the doctrine of respondeat superior; rather, a district may be liable only "if its own direct negligence is established." (*John R. v. Oakland Unified School Dist.* (1989) 48 Cal.3d 438, 441.) Thus, in cases involving sexual misconduct by a school district employee, the school district that employed the abuser can be held liable for the negligent hiring, retention, or supervision of that employee if the district's employees knew or should have known that the employee posed a reasonably foreseeable risk of harm to students. (*C.A., supra*, 53 Cal.4th at p. 870; *Virginia G. v. ABC Unified School Dist.* (1993) 15 Cal.App.4th 1848, 1855.) The District argues that under this general standard of the duty of care, it cannot be held liable

involved a student who sued his school district for negligent hiring, retention, and supervision, based on alleged sexual harassment and abuse by the student's high school guidance counselor. (*C.A., supra*, 53 Cal.4th at p. 866.) The Supreme Court held that school authorities, by the nature of their special relationship with their students, have "a duty to 'supervise at all times the conduct of the children on the school grounds and to enforce those rules and regulations necessary to their protection,' " and that this duty "includes the duty to use reasonable measures to protect students from foreseeable injury at the hands of third parties." (*Id.* at pp. 869–870.)

The trial court in this case considered all three of the ways in which plaintiff alleged that the District had violated its duty of care to plaintiff— (1) in its hiring of Cortes, (2) in its retention of Cortes, and (3) in its supervision of Cortes, and concluded that the District was entitled to judgment with respect to each theory. On appeal, plaintiff does not focus on the hiring or retention, but focuses solely on the theory that there remain material facts in dispute with respect to whether the District exercised sufficient supervision of Cortes. Specifically, plaintiff's theory is that the District's failure to properly supervise Cortes stems from *Sakamoto's* alleged

as a matter of law unless it "ha[s] prior actual knowledge of the offender's assaultive propensities." (Boldface and some capitalization omitted.) Such an argument was recently rejected in *Doe v. Lawndale Elementary School Dist.* (2021) 72 Cal.App.5th 113, 128–137 (*Lawndale Elementary*), where the court rejected the idea that a school district's general duty of care to use reasonable measures to protect a student from foreseeable injury caused by an employee's intentional conduct is limited to those situations in which a district had actual knowledge that an employee previously engaged in or had a propensity to engage in sexual misconduct. We agree with the *Lawndale Elementary* court that no such limitation on the general duty exists; a school district's duty to prevent sexual abuse is not limited to circumstances where administrators know that a particular employee previously engaged in sexual misconduct or had the propensity to do so.

24

failure to properly understand or view Cortes's conduct as suspicious, and that a fact-finder could conclude that Sakamoto should have suspected abuse and should have informed her supervisor that she suspected that Cortes was abusing plaintiff.  Plaintiff asserts, for example, that the evidence supports her contention that there were "repeated failures on the District's part related to the supervision of the driver, leading to his improper retention despite repeated assaults upon plaintiff."  Focusing on how the District's supervision of Sakamoto purportedly led to negligent supervision of Cortes, plaintiff asserts:  "The evidence demonstrates that the finder of fact could reasonably conclude that any *training or supervision* that was provided *to the bus attendant* was insufficient, resulting in the *attendant's failure* to see repeated, unnecessary, close contact between the bus driver and the Plaintiff as suspicious, resulting in the *attendant's failure* to take action to stop that inappropriate behavior."  (Italics added.)  According to plaintiff, "If no other District personnel were present and exercising control over plaintiff at the time of the driver's actions, plaintiff could only bring a claim based upon the District's failure to properly hire, supervise, or retain the driver."  Plaintiff contends that "[t]he presence of the bus attendant requires review of her conduct as well, and liability may be imposed upon the District for the bus attendant's independent acts of negligence."  Thus, plaintiff claims, her negligence action against the District may be "based upon the failure of the [bus] attendant to perform her duties as an employee of the District responsible for students in her care, and for her failure to report suspicious conduct as a mandatory reporter of suspected abuse or neglect."[18]

---

[18]     Although plaintiff hints at a theory that the District breached its duty to adequately supervise the students on the bus and its own employees by failing to review the video recordings from the bus until after an accusation of abuse was made, plaintiff relates this argument back to *Sakamoto's* allegedly

It thus appears that on appeal, plaintiff is arguing *only* that summary judgment should not have been granted because there remains a material issue in dispute as to whether the District negligently *supervised and/or trained the bus attendant*, such that the bus attendant failed to appreciate that Cortes's conduct vis-à-vis plaintiff was suspicious, and that as a result, the bus attendant failed to report such suspicions to District administrators, who would then have been on notice of Cortes's "suspicious" conduct, and could have prevented at least some of the abuse.[19] Given the parties' focus on whether the District may be held liable under this theory, we focus our

---

negligent conduct, *not* the District's conduct in failing to adequately supervise Cortes by not watching the videos. For example, in briefing, plaintiff argues that "[t]he District's supervision was also lacking in that it had video recordings of what occurred on the bus in its control, but never looked at the tapes unless a complaint was received. [Citation.] Video surveillance can be an effective way to monitor the behavior of employees including employee[s'] implementation of district policies and procedures. [Citation.] . . . By not viewing the records, the District missed an opportunity to use one of its resources to monitor *the bus attendant's* performance, which would have provided an opportunity to correct the *attendant's* behavior before further injury occurred to the Plaintiff over time." (Italics added.)

[19] In arguing that Cortes's conduct in being near plaintiff and in her "personal space" should have aroused Sakamoto's suspicion, plaintiff implicitly concedes that the only way that any employee of the District could have become suspicious that Cortes was committing abuse would be to have witnessed Cortes behaving inappropriately toward plaintiff or another child. Plaintiff essentially acknowledges that, prior to the first act of abuse, there was no behavior on the part of Cortes that would have caused concern. Further, plaintiff consistently argues that what should have made Sakamoto suspicious was Cortes's "repeated" conduct in standing near plaintiff, thus implicitly conceding that a single instance of such conduct would not have been sufficient to render the behavior suspicious. Thus, even by plaintiff's own argument, the District could not have had sufficient knowledge of, or reason to know, facts that could have enabled it to prevent *all* instances of the inappropriate sexual contact.

attention on whether plaintiff is correct in arguing that summary judgment was improperly granted because there remain material facts in dispute with respect to this theory.

Plaintiff argues that the evidence shows that the District's training of Sakamoto was inadequate in two ways, and that as a result of this inadequate training, Sakamoto did not comprehend that Cortes's conduct on the bus was suspicious and an indicator that he was abusing plaintiff. Plaintiff reasons that the District failed to properly train Sakamoto with respect to the roles of bus attendant and bus driver, arguing that Sakamoto "was never instructed that the driver was not to help with the children, only drive the bus, when an attendant was present," and that Sakamoto's "misunderstanding" of the roles "would necessarily impact her view of whether conduct by the driver was appropriate or not." Plaintiff also separately argues that the District's training of Sakamoto was insufficient to the extent that it failed to properly train her regarding her role as a mandated reporter of suspected child abuse, and specifically, that the District's training with respect to the duties of a mandated reporter "did not involve teaching bus attendants to be suspicious of things such as seeing a bus driver routinely buckling in a ten year old who is physically and mentally able to buckle herself in."

With respect to the theory that Sakamoto was improperly trained as to the roles of the bus attendant and the bus driver, we conclude that plaintiff's theory in this regard is not supported by evidence, and that plaintiff cannot establish a breach of the duty of care as a matter of law given the undisputed facts.[20]

---

[20]   We recognize that typically, questions of breach as well as factual and legal causation with respect to a claim for negligence, are questions for a jury.

First, plaintiff's theory relies on the idea that because Sakamoto was not properly trained as to the respective roles of bus attendant and bus driver, she did not understand that Cortes's conduct with respect to plaintiff was suspicious. Plaintiff's theory requires that there be evidence that Sakamoto saw the conduct that plaintiff describes in her brief—i.e., that Sakamoto actually saw what amounts to "suspicious conduct" but failed to recognize that conduct as suspicious. However, as noted, the record does not demonstrate that Sakamoto observed Cortes doing any of the things that plaintiff repeatedly relies on as evidence of Cortes's suspicious conduct. For example, plaintiff argues that Sakamoto should have been suspicious either because Cortes was assisting plaintiff with her seatbelt despite plaintiff not requiring such assistance, or that Sakamoto should have been suspicious simply because Cortes was "repeatedly" standing near plaintiff, despite the fact that plaintiff undisputedly did not require assistance in securing herself in her seat.

To the extent that plaintiff argues that Sakamoto should have been suspicious of the fact that Cortes was assisting plaintiff with her seatbelt, it is undisputed that Sakamoto *never witnessed Cortes assist plaintiff* in getting seated or with her seatbelt. The undisputed evidence further demonstrates that Sakamoto did not see Cortes touch plaintiff in even a nonoffensive manner, and that she "did not have *any indication* that Logan Cortes had touched any student, including Plaintiff Victoria Doe, in an inappropriate or

_____

(*Brown, supra*, 11 Cal.5th at p. 228 (conc. opn. of Cuéllar, J.).) However, summary judgment is appropriate "where reasonable jurors could draw only one conclusion from the evidence presented." (*Federico v. Superior Court (Jenry G.)* (1997) 59 Cal.App.4th 1207, 1214.)

sexual manner at any time on or before May 11, 2017."[21]  (Italics added.) Thus, there is no evidence from which a factfinder could conclude that Sakamoto saw Cortes assisting plaintiff in getting settled in her seat and buckling her seatbelt and thus should have been suspicious that he was abusing plaintiff based on this conduct.[22]

Plaintiff nevertheless suggests throughout her briefing that she has identified factual issues that remain in dispute because, even if there is no evidence that Sakamoto saw Cortes "assisting" plaintiff in getting secured in her seat, Sakamoto should have been suspicious that Cortes was abusing plaintiff based on the fact that he was "repeatedly" in "close contact" with

---

[21]    Plaintiff's admission with respect to this statement of fact slightly changed the wording, but this change did not alter the meaning.  Plaintiff "[a]dmitted that Margaret Sakamoto did not have any indication that Logan Cortes had by her understanding touched any student, including Plaintiff Victoria Doe in an inappropriate or sexual manner at any time on or before May 11, 2017."

[22]    Among the statements that plaintiff makes throughout her briefing suggesting that Sakamoto's suspicions should have been aroused by Cortes assisting plaintiff when no assistance was necessary are the following:

— "But Mangold did not teach bus attendants to be suspicious of things such as seeing a bus driver routinely buckling in a ten year old who is physically and mentally able to buckle herself in."

— "And the District teaches student independence, so even just a driver repeatedly assisting a student who was known to not need assistance would be engaging in suspicious behavior."

— "Sakamoto's mistaken understanding of the bus driver's and attendant's roles meant that she did not see a driver assisting a student as a problem . . . ."

— "It was Sakamoto's role to assist the Plaintiff on and off the bus if needed, not the driver's, and Sakamoto was aware that the Plaintiff did not require assistance."

29

plaintiff, and "invading" plaintiff's "personal space." Plaintiff argues that "[t]he evidence demonstrates that the finder of fact could reasonably conclude that any training or supervision that was provided to the bus attendant was insufficient, resulting in the attendant's *failure to see repeated, unnecessary, close contact between the bus driver and the Plaintiff as suspicious*, resulting in the attendant's failure to take action to stop that inappropriate behavior."

Specifically, plaintiff argues, "The District contends that Sakamoto never actually saw Cortes buckling Plaintiff into her seat. However, if Sakamoto never saw Cortes buckling Plaintiff into her seat, then Sakamoto could have no non-suspicious explanation for what the driver was doing standing so close to Plaintiff on repeated occasions. And it cannot be argued that Sakamoto did not see Cortes near the Plaintiff, as at least two of the videos the District identified show that she did, without taking any action."

Plaintiff attempts to create a triable issue of material fact by contending that Sakamoto *must have* seen Cortes "repeatedly" standing near plaintiff for no good reason, and thus, that Sakamoto had reason to suspect abuse. But plaintiff points to no evidence that Sakamoto actually *did* see such conduct. During her deposition, Sakamoto was asked whether, on May 11, 2017, she saw Cortes leaning into the front seat where plaintiff was sitting, and then returning to the driver's seat after Sakamoto was no longer distracted by the student she was assisting. Sakamoto responded, "No." Sakamoto was also asked about the police report, which noted that the video recordings from May 4, 8, 9, 10, and 11, 2017 each showed Cortes with his back to the camera, blocking the camera's view of what, exactly, Cortes was doing. With respect to May 8, 9, 10, and 11, Sakamoto was read the description in the police report of what the video recordings from that day showed, which included a description of Cortes "leaning" into the seat where

30

plaintiff was sitting. She was then asked whether she had seen what was described in the police report. As to each incident, Sakamoto said that *she had not seen* what was described.[23] These undisputed facts, supported by the underlying evidence, were sufficient to meet the District's initial burden to show that plaintiff cannot demonstrate that Sakamoto knew or had reason to know about the abuse prior to May 11, which is the date on which plaintiff's mother first reported Cortes's behavior to the District.

The evidence on which plaintiff relies in suggesting that there remains a triable issue in dispute because Sakamoto *must have seen* Cortes standing near plaintiff is insufficient to raise a triable issue of fact. Specifically, plaintiff contends that one can infer from the fact that Sakamoto is seen on two video recordings walking toward the front of the bus while Cortes was standing at the front of the bus that Sakamoto did, in fact, see Cortes standing near plaintiff on these two occasions.[24] However, even if a fact-finder concluded that Sakamoto did observe Cortes standing near plaintiff on

---

[23]    In reply briefing, plaintiff contends that Sakamoto "never stated whether she saw the driver walk down the aisle and invade plaintiff's personal space after the plaintiff was settled into her seat." This argument is contradicted by Sakamoto's deposition testimony, where she was specifically asked whether she had seen what was described as being depicted in the video recordings, including Cortes "leaning" into to the seat where plaintiff was sitting, and she answered "No."

[24]    Although plaintiff contends in her briefing on appeal that "[i]n *several* of the video tapes of the events on the bus produced in discovery by the District, Sakamoto can clearly be seen walking up the aisle of the bus with a direct line of sight to the driver, who is standing in the aisle of the bus next to where plaintiff is seated" (italics added), plaintiff concedes in her separate statement of undisputed facts that it is only in "two of the videos" that Sakamoto can be seen "walk[ing] up the aisle to where Mr. Cortes is standing next to Victoria Doe to take her seat across the aisle from Victoria Doe . . . ."

31

these two occasions, given the other undisputed facts, such a conclusion does not permit a reasonable inference that Sakamoto should have suspected that abuse was occurring on those two occasions. Again, it is undisputed that plaintiff always sat at the front of the bus, a mere one or two steps from the driver's seat.[25] A bus driver standing at the front of the bus, near a student but also near his own seat, is not, on its own, inherently suspicious conduct. A factfinder would have to infer that any reasonable person who witnessed a bus driver standing in a location that was both near his seat and also near a student on two occasions would conclude that the bus driver was acting suspiciously; we cannot conclude that such an inference would be reasonable in these circumstances. Given the abundant innocent reasons why a bus driver might stand at the front of the bus while waiting for another employee to assist a student, we cannot conclude that any reasonable person would have suspected that child abuse was occurring based on this conduct alone.[26]

---

[25] In briefing, plaintiff often describes Cortez's conduct in a manner that does not comport with what may be reasonably inferred from the undisputed fact that plaintiff always sat at the front of the bus, either directly across from the driver's seat or a mere one or two steps away from the driver's seat. For example, plaintiff asserts that Sakamoto "never stated whether she saw the driver *walk down the aisle* and invade plaintiff's personal space." Elsewhere she states, "activity on the part of the driver leaving his seat and *walking down the center aisle*, should be instantly visible to others on the bus, especially other adults" and that the "assaults occurred on a daily basis when [Cortes] left the driver's seat and walked down the aisle of a school bus to where plaintiff was seated, in plain view of anyone paying the remotest attention." Because it is undisputed that Cortes was never more than one or two steps away from his own seat while interacting with plaintiff, these descriptions overstate what the evidence actually shows.

[26] The undisputed facts presented with respect to the District's motion for summary judgment and the video evidence make clear that Cortes made efforts to conceal his interactions with plaintiff from Sakamoto. It is undisputed that he engaged in the conduct specifically while Sakamoto was

Plaintiff also contends that the District failed to adequately train Sakamoto regarding her duties with respect to being a mandated reporter of suspected child abuse, under Penal Code section 11166.[27]  Plaintiff argues that "[t]he bus attendant was required to be knowledgeable about behaviors suggesting possible child abuse, and to be vigilant in watching for suspected abuse . . . .  Yet Sakamoto failed to identify the driver's repeated, improper actions as suspicious, and failed to report any of the driver's actions as required."

CANRA requires a "mandated reporter," which includes teachers and certain other school employees, "to make a report to a law enforcement agency or a county welfare department 'whenever the mandated reporter, in his or her professional capacity or within the scope of his or her employment, has knowledge of or observes a child whom the mandated reporter knows or reasonably suspects has been the victim of child abuse or neglect.' " (*B.H. v. County of San Bernardino* (2015) 62 Cal.4th 168, 186 (*B.H.*); see Pen. Code, § 11165.7.)  The failure of a mandated reporter to make the required report is a misdemeanor.  (Pen. Code, § 11166, subd. (c).)

Even though Sakamoto provided testimony through her declaration that she never observed any interaction that caused her to suspect that Cortes was behaving inappropriately, including stating that she never saw Cortes "lean[ ]" in toward plaintiff, plaintiff argues that if Sakamoto had been properly trained as to the requirements of CANRA she would have known to

---

busy assisting another student in the back of the bus and was focused on her duties with that student.  It is also undisputed that Cortes engaged in this conduct with plaintiff, who sat close to the driver's seat, enabling him to return to his seat quickly and without being detected.

[27]    Plaintiff is referring to the provisions of the Child Abuse and Neglect Reporting Act (CANRA; Pen. Code, § 11164 et seq.).

have reported Cortes to District administrators when she had "simply 'reasonable suspicion' to suspect child abuse or neglect was occurring [under CANRA]. Plaintiff argues that the "reasonable suspicion standard was chosen intentionally, lowering the bar for required reporting as a means of providing further protection to children potentially subject to abuse," and further argues that if the "reasonable suspicion" standard "is applied, the bus driver's repeated actions raised reasonable suspicion."[28]

Plaintiff is correct that CANRA employs an objective standard for evaluating the reasonableness of a mandated reporter's suspicion. Penal Code section 11166, subdivision (a)(1), states " 'reasonable suspicion' means that it is objectively reasonable for a person to entertain a suspicion, based upon facts that could cause a reasonable person in a like position, drawing, when appropriate, on the person's training and experience, to suspect child abuse or neglect." (See also *B.H., supra*, 62 Cal.4th at p. 193 ["Mandated reporters have *mandatory* reporting duties which are governed by an objective standard"].) However, plaintiff fails to take into account the fact that even under the objective standard applicable to mandated reporters under CANRA, the question of reasonable suspicion is based on facts *actually known* to the person, not on facts that a reasonable person *should have discovered or could have discovered through further investigation*. (See *Lawndale Elementary, supra*, 72 Cal.App.5th at pp. 139–140 [CANRA's objective standard for reasonable suspicion imposes duty to report reasonable suspicion based on facts known to mandated reporter, and does not require mandated reporter to investigate or discover additional facts].)

---

28      In reply, plaintiff contends that the standard applicable under CANRA "significantly lowers the bar for reporting from actually observing the abuse, [to] requiring reporting when a required reporter can entertain any reasonable suspicion of abuse."

As we previously explained, none of the evidence demonstrates that Sakamoto observed the conduct that plaintiff describes as having been captured on the video recordings, which were taken from a different angle and show Sakamoto assisting another student at the times the abusive conduct occurred. The evidence presented by the District was that Sakamoto did not observe Cortes engaging in any of the conduct seen on the video recordings, including leaning in toward plaintiff. Further, plaintiff testified at her deposition that each time the abuse took place, it occurred while Sakamoto was assisting another student in the back of the bus. Plaintiff did not present evidence contradicting Sakamoto's testimony that she did not observe any of the conduct that can be seen on the video recordings, nor did she offer any other evidence from which one could conclude that Sakamoto was aware of any *other* facts from which a reasonable person in a like position would have suspected that Cortes was sexually abusing plaintiff. (See *Prue v. Brady Co./San Diego, Inc.* (2015) 242 Cal.App.4th 1367, 1375 [if the party moving for summary judgment "meets [its initial] burden of production, the burden then shifts to the opposing party to produce admissible evidence showing a triable issue of material fact exists"].) In view of this evidence, there is no additional CANRA training that the District could have provided to Sakamoto that would have changed the facts known to Sakamoto or the conclusions that Sakamoto could have reasonably been expected to draw from those facts. The reasonable suspicion standard from CANRA therefore does not alter the analysis; the undisputed facts do not permit the conclusion that Sakamoto was aware of facts that would have led her to reasonably suspect that Cortes was abusing plaintiff.

IV.

DISPOSITION

The judgment of the trial court is affirmed.  The District is entitled to costs on appeal.

AARON, Acting P. J.

WE CONCUR:

DATO, J.

DO, J.